DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Erin W., appeals from a judgment of the Court of Common Pleas of Lorain County, Juvenile Division, that terminated her parental rights to her minor child, M.W., and granted permanent custody of the child to the Lorain County Children's Services ("LCCS"). This Court reverses.
 I. {¶ 2} Erin is the natural mother of M.W., born June 11, 2002. At the time of the birth of M.W., Erin was seventeen years old and a high school student. The biological father of the child was not determined.[1] LCCS had been involved with Erin and her parents during the pregnancy, and provided counseling services to address issues between Erin and her parents. Erin originally intended to place her child for adoption, but by the time the child was born, she decided to attempt to raise the child herself. Erin's parents, however, were either unwilling or unable to provide a home for Erin and M.W. at the time, and Erin did not have a home or the means of caring for herself and the child.
 {¶ 3} Therefore, on June 13, 2002, LCCS filed a complaint, alleging that the child was neglected and dependent. On July 11, 2002, the trial court adjudicated M.W. to be dependent and placed her in the temporary custody of LCCS. Erin was also, apparently, found to be dependent and placed in the temporary custody of LCCS. Erin and M.W. lived together in the same foster home at first. Later, Erin was placed in a separate foster home and then in an apartment.
 {¶ 4} On April 8, 2003, Erin turned eighteen and was released from the custody of LCCS. On April 11, 2003, LCCS moved for permanent custody of M.W. Following a hearing on the motion, the trial court terminated parental rights and placed M.W. in the permanent custody of the agency. Erin has timely appealed from that judgment and has asserted one assignment of error for review.
 II. ASSIGNMENT OF ERROR
"The trial court's award of permanent custody of [M.W.] to Lorain County Children's Services because there was clear and convincing evidence that the child could not be placed with her parents within a reasonable time and that an award of permanent custody was in the best interest of the child was not supported by clear and convincing evidence and was contrary to law."
 {¶ 5} Through her sole assignment of error, Erin essentially contends that the judgment of the trial court was not supported by the weight of the evidence. She challenges the finding that the child could not or should not be placed with her within a reasonable time, and also the finding that it was in the best interest of the child to be placed in the permanent custody of LCCS.
 {¶ 6} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In reOzmun (Apr. 14, 1999), 9th Dist. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 7} Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
 {¶ 8} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve of the prior twenty-two months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 99.
 {¶ 9} The relevant facts in the record before this Court establish the following. Erin met Linda Williams, an employee of Lorain County Juvenile Court at Pathways Group Home and an experienced foster parent, while she resided at the group home during her pregnancy. While at the group home, Erin became encouraged to raise her child herself. When Erin was essentially rendered homeless after the birth of her child, she called Williams. Williams initiated the plan to take them both into her home in a fostering capacity.
 {¶ 10} Williams gave Erin a place to live, but provided no child care to M.W. at all. Erin was to be solely responsible for the care of her child. Williams helped Erin arrange for a babysitter to use while she was in school, working, or attending independent living classes. Williams was admittedly strict with Erin. Her goal was to help Erin learn to independently provide for the baby. The caseworker told Williams not to help Erin because she wanted her to have a realistic view of what being a young single mother would involve.
 {¶ 11} Erin's case plan, as approved by the trial court, required her to: (1) successfully complete her senior year of high school and graduate; (2) maintain employment to provide for the basic needs of herself and her child, including food, clothing, shelter, medical needs, and educational needs; and (3) successfully complete the Independent Living Program.
 {¶ 12} By all accounts, Erin did very well at the beginning of this plan in terms of caring for her child, attending school, and working. Erin was working ten hours a week and attending independent living classes once a week after school. Williams stated that she received good reports as to Erin's progress in the independent living program and Erin was also reported to be a good worker at her job.
 {¶ 13} Eventually, Erin found it necessary to greatly increase her hours of work[2] in order to earn enough money to pay for the items her case plan required.[3] Erin explained that she increased her work hours because she was required to save one-half of her earnings. Kathy Isner, the LCCS caseworker, testified that Erin's money management was fine, except in the Christmas season when she was purchasing gifts.
 {¶ 14} As a result of the manner in which LCCS implemented the case plan, Erin was rising at 5:30 a.m. or 6:00 a.m. in order to get herself and the child ready for the day. She then walked M.W. five blocks to the baby sitter's home and five more blocks to school. Following school, work, and independent living classes, Erin took a bus to the babysitter's home to pick up the child, and walked home about 9:30 p.m. In bad weather, Williams said she provided transportation to the babysitter's home. Erin then bathed the child, put her to bed, did household chores and finished homework for school. Erin frequently would not get to sleep until midnight or later. Williams testified that she did not give Erin "any free time" because she thought Erin should devote all her time and attention to the child as that was a "full-time job." She agreed that this was a lot to ask of a seventeen-year old, but believed the case plan required it.
 {¶ 15} With this schedule, things began to deteriorate. Erin had increased tardiness and absences from school, had trouble keeping up with her schoolwork, and was unable to attend her Independent Living sessions. Tensions grew between her and the foster family.[4] One of Erin's teachers contacted Williams to let her know that Erin was falling asleep in school. When Erin began having problems meeting her responsibilities, extra programming from Parents to Teachers and Healthy Start was added to her schedule. Eventually Erin had difficulty keeping these appointments as well.
 {¶ 16} In March 2003, Erin and Williams had a shouting match, which resulted in Erin being placed in a foster home separate from her child. Erin was in that placement for one month. At the time, Erin was extremely upset about being separated from her child. She was reported to be AWOL several times during this placement, though no additional negative behavior was reported to be connected to Erin's failure to account for her whereabouts.
 {¶ 17} Upon turning eighteen, Independent Living helped Erin obtain an apartment and subsidized the rent for the apartment, with the condition that Erin comply with a behavioral contract. Erin's behavioral contract required her to attend high school and work part-time. She was to have no drug or alcohol use, no overnight guests, no illegal activities, and she was to turn in her pay stubs and grade cards. It was reported that in the month prior to the permanent custody hearing, Erin failed to verify her job or GED enrollment and, therefore, became ineligible for the rent subsidy.
 {¶ 18} Upon this record, the trial court found that the child cannot be placed with either of her parents within a reasonable time or should not be placed with her parents. The trial court did not specifically rely on any of the factors set forth in R.C.2151.414(E).[5] As to the father, the trial court found that the whereabouts of two possible fathers could not be ascertained and that neither had demonstrated any interest in the child. As to Erin, the trial court found that she failed to meet her case plan objectives. The trial judge cited her failure to graduate, being argumentative in foster care which ultimately led to her removal, a positive drug screen, being AWOL from her second foster placement several times, her failure to regularly attend sessions with her service providers, no longer being eligible for the rental subsidy on her apartment, losing her job at Burger King in July 2003, and a failure to demonstrate a plan for completion of her education.
 {¶ 19} Upon careful review of the record, this Court finds that the weight of the evidence fails to clearly and convincingly support a finding that the child cannot be placed with Erin within a reasonable time or should not be placed with her.
 {¶ 20} The evidence regarding Erin's care of M.W. established that she was appropriate, affectionate and loving to the child. Caseworker Isner reported that Erin was very loving, attentive, cared about the way the baby looked, played with her, and was tender with her. While Isner indicated that the babysitter reported the baby occasionally arrived at her home "dirty and unkempt," the caseworker herself never observed the child to be so. Williams' greatest concern regarding Erin was reported to be Erin's attitude toward the members of the Williams family and the need to follow rules. During the joint foster placement, Erin arranged for the medical care of M.W. The child was reported to be current on her pediatric appointments. Erin admitted at the hearing that she may have let school, job, and other responsibilities slip, but not the care of her child. When Erin was removed from the joint foster placement, she participated in visitation with the child two times a week for five months. She missed five sessions.
 {¶ 21} Although Erin did lose her job at Burger King, it should also be noted that she held the job for nine months, received good reports in the beginning, increased her hours all along, and was only terminated after the motion for permanent custody was filed. Furthermore, by the time of the permanent custody hearing, Erin had obtained full time office employment.
 {¶ 22} Erin did have one positive drug screen for marijuana. However, no one from LCCS apparently believed that the circumstances warranted changes in her case plan, nor is there any evidence that the care of her child was affected. Erin testified that she voluntarily started attending Lorain County Alcohol and Drug Abuse Services ("LCADA") three times a week for three hours per session — "to make myself better." Caseworker Isner's testimony corroborates Erin's testimony that LCCS did not order her to attend LCADA.
 {¶ 23} At the time of the permanent custody hearing, the trial court did have another placement option besides placing the child in the permanent custody of LCCS. Erin's father, Michael W., testified that he is currently able to provide a home for Erin and M.W. and explained that there were legitimate reasons for his inability to provide more support or a home for Erin earlier. He had had serious medical problems, including the amputation of a leg in February 2002 due to complications from diabetes. He had also been engaged in a three-year legal effort to obtain social security benefits. Nevertheless, he had engaged in daytime visits with Erin and M.W. every three to four weeks during these proceedings and communicated with Erin by telephone when he was physically unable to travel. LCCS considered Michael W. to be an inappropriate placement because his health and plans for an apartment were too indefinite, and they would not consider his present income because Erin's case plan had expired.
 {¶ 24} However, Michael W. testified that his medical and financial situations were stabilized and much improved. He testified that he had obtained a prosthetic leg in September 2002, and was generally healthier. He was exercising, playing golf, and riding a bicycle daily. He also testified that as of May 2003 he had been successful in his three-year legal effort to obtain social security benefits. He obtained a lump sum settlement and was also receiving monthly benefits. Michael W. planned to obtain an apartment in North Ridgeville before September 1, 2003. He and Erin had an appointment to enroll Erin in North Ridgeville High School on the Monday following the permanent custody hearing.[6] He offered to provide a home and care for M.W. while Erin attended school and worked at a convenience store next door to the apartment. The convenience store was owned by a friend of Michael W. and Erin reportedly had a job offer to work there.
 {¶ 25} By the time of the court hearing, the major obstacles to Michael W. providing a home for Erin and the baby had been removed. The plan was a reasonable one that would keep the family together and would provide stability for the child. Courts must remain mindful that parents have a fundamental liberty interest in the care and custody of their children. Santosky v. Kramer
(1982), 455 U.S. 745, 753, 71 L.Ed.2d 599. This fundamental interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." Id. The termination of parental rights must be the alternative of "last resort" in protecting the welfare of children. In re Cunningham (1979), 59 Ohio St.2d 100, 105.
 {¶ 26} This Court understands that the guardian ad litem concluded that Erin did not make good choices in such matters as dropping out of school, and failing to keep appointments with service providers. However, it appears from the record that the manner in which Erin's case plan was being implemented severely limited her possible choices and virtually guaranteed failure as to at least some of the goals set out in the court-approved case plan.
 {¶ 27} Prior to coming under the supervision of LCCS, Erin kept all her pre-natal appointments and complied with doctor-ordered bed rest for three months before giving birth to a healthy baby. She had a 3.8 grade point average before her senior year of high school. LCCS then insisted that Erin complete high school, hold a job, place half her earnings in a savings account, attend programs with three service providers, and be fully responsible for the care of an infant. Not many single parents could easily manage such responsibilities.
 {¶ 28} While graduating from high school is certainly important and saving half of one's earnings is a commendable goal, these aspirations do not exist as immediate imperatives when they result in a present inability to provide and care for one's child. The requirement that Erin save half of her earnings was not included in any case plan approved by the trial court. That requirement was apparently LCCS's idea of proper implementation of the case plan. Because of this requirement, Erin was compelled to work twice as many hours to earn what she needed to meet her obligations under the court-approved case plan. A single change in this regard might have permitted Erin to have graduated from high school and now be in a much better position to have the time and financial ability to provide for her child.
 {¶ 29} It is commendable that LCCS placed the young mother and her child together, and it is unfortunate that they could not be placed together again when the tensions between Williams and Erin grew to be unmanageable. Care must be used in implementing such a plan, however. Public child-placing agencies have much discretion in putting together reasonable case plans for parents who are at risk of having their parental rights terminated, and have similar discretion in implementing those case plans. But the end result must be one that has some reasonable chance of promoting the reunification of the family and not one that seems likely to be doomed to failure or to promote separation.
 {¶ 30} Because we find error in the determination of the trial court that the child cannot be placed with her parent within a reasonable time or should not be placed with her parent, it is not necessary for us to consider the finding of the trial court regarding the best interest of the child. The assignment of error is well taken.
 III. {¶ 31} Appellant's sole assignment of error is sustained. The judgment of the trial court is reversed and the cause remanded for further proceedings.
Judgment reversed and cause remanded.
Whitmore, J. and Batchelder, J., concur.
[1] Two potential fathers were named by Erin, but could not be located. Both were served by publication. Neither of them appeared or participated in the proceedings below.
[2] The caseworker testified that she was aware that Erin was working at least 20 to 25 hours per week. Erin testified that she was eventually working 40 hours per week.
[3] Kathy Isner, the CSB caseworker, testified that Erin was expected to provide only diapers, baby food, and formula. Erin testified, consistently with the case plan, that she also had to provide more, including food, shampoo, and soap.
[4] The foster family included not only Williams, Williams' husband, Erin and M.W., but also an adopted eight-year-old girl, an adopted nine-year-old boy, a fourteen-year-old granddaughter of whom Williams was the guardian, and a seventeen-year-old foster son. In addition, by the fall, Williams' twenty-seven — year-old daughter and her husband were "in and out" of the home. Conflicts began to develop between Erin and some members of the Williams' family. This acerbated the relationship between Erin and Williams.
[5] In its appellate brief, LCCS asserted that the first prong of the permanent custody test had been met by two factors that were not a part of the finding of the trial court, i.e. that the parent was incarcerated and that the child had been in the custody of the agency for twelve of the prior twenty-two months. Because those factors were not a part of the findings of the trial court, they may not properly be relied upon by this Court in reviewing the judgment of the trial court.
[6] Erin had also enrolled in a GED program at the Lorain County Community College for the fall. She therefore had two reasonable options for completing her high school education.