DECISION AND JOURNAL ENTRY
{¶ 1} Appellants, Elizabeth Cather and Richard Swope, Jr., have separately appealed from the judgment of the Summit County Court of Common Pleas, Juvenile Division, terminating their parental rights and placing their minor child, P.C., in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I {¶ 2} Cather and Swope are the natural parents of P.C., who was born on July 18, 2001. Paternity was determined during these proceedings following genetic testing. At the time of P.C.'s birth, Cather's three other children were in the temporary custody of the Portage County Division of Job and Family Services ("Portage County agency"). On July 19, 2001, while P.C. was still in the hospital, CSB filed a complaint in the Summit County Court of Common Pleas, Juvenile Division, alleging that P.C. was a dependent child and seeking emergency temporary custody of the child. CSB was acting on information from the Portage County agency that Cather was homeless, had poor parenting skills, had a history of drug usage, and also that the Portage County agency had temporary custody of Cather's three older children.
 {¶ 3} The juvenile court granted emergency temporary custody to CSB and the child was placed with the maternal grandmother. Cather also resided with them. Genetic testing was ordered to determine the biological father.
 {¶ 4} On October 1, 2001, P.C. was adjudicated a dependent child pursuant to an agreement of the parties. Swope and Cather were present at the hearing, with Swope being represented by counsel, and Cather being represented by substitute counsel. Previously ordered genetic testing had not taken place because of confusion over the dates, and was rescheduled. The trial court adopted the case plan filed by CSB.
 {¶ 5} This case plan required Cather to: (1) obtain and maintain safe and independent housing,[1] with adequate furnishings and working utilities; and (2) raise the level of her parenting skills so that she could create a daily routine that meets her child's developmental needs. The alleged fathers were required to establish paternity. The biological father was then to: (1) provide financial support; (2) establish regular visitation; (3) maintain stable housing; and (4) demonstrate appropriate parenting skills.
 {¶ 6} An amended case plan was filed on October 31, 2001. That case plan included the following additional requirements as to Cather: (1) comply with the rules of her probation; (2) address concerns regarding domestic violence by attending anger management classes or individual counseling; (3) attend parenting classes because of ongoing concerns regarding her parenting; (5) seek employment or financial assistance in order to provide for her own and her child's basic needs; (5) continue counseling for depression; and (6) participate in visitation with the child.
 {¶ 7} This case plan also included the following additional requirements as to Swope: (1) address concerns regarding domestic violence by attending anger management classes or individual counseling; and (2) participate in visitation.
 {¶ 8} On November 1, 2001, following a dispositional hearing, a parent and child relationship was found to exist between Swope and P.C. The child was placed in the temporary custody of CSB, but removed from her previous placement with the maternal grandmother and placed in foster care.
 {¶ 9} The case plan was amended again on May 23, 2002, establishing additional objectives for Swope, and requiring him to: (1) participate in a chemical dependency assessment and follow all recommendations; and 2) participate in a psychological assessment and follow all recommendations.
 {¶ 10} On October 22, 2002, CSB moved for permanent custody of P.C. Swope and the maternal grandmother each moved for legal custody. All motions were heard by a magistrate, who denied the motions for legal custody, awarded permanent custody of P.C. to CSB, and terminated the parental rights of both parents. Swope and Cather filed separate objections. The trial judge overruled the objections and adopted the judgment of the magistrate, granting permanent custody to CSB and terminating the parental rights of each parent.
 {¶ 11} Swope and Cather have separately appealed from the judgment of the trial court. Swope has assigned one error for review and Cather has assigned eight errors for review. This Court will address Swope's sole assignment of error and Cather's fourth assignment of error together because they are related. Cather's third, seventh, and eighth assignments of error will also be considered together. The remaining assignments of error will be considered in due course.
 II Swope's Assignment of Error
"The trial court erred in granting permanent custody of the minor child to CSB and terminating the father's parental rights as such decision was against the manifest weight of the evidence."
 Cather's Assignment of Error Number Four
"The trial court's order terminating appellant-mother's parental rights was against the manifest weight of the evidence, contrary to law and/or an abuse of discretion."
 {¶ 12} Through these assignments of error, Swope and Cather each challenge the judgment of the trial court as being unsupported by the weight of the evidence.
 {¶ 13} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In reOzmun (Apr. 14, 1999), 9th Dist. No. 18983, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 14} Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
 {¶ 15} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C.2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99.
 {¶ 16} The trial court found that the first prong of the permanent custody test was met by the fact that the child had been in the temporary custody of CSB for more than 12 months of the prior 22-month period. See R.C. 2151.414(B)(1)(d). The child entered the temporary custody of CSB on September 17, 2001, temporary custody being statutorily defined for these purposes as 60 days after the child's removal from the home. See id. The motion for permanent custody was filed on October 22, 2002. Therefore, the child had been in the temporary custody of CSB for more than 12 months of the prior 22-month period at the time the motion for permanent custody was filed. Accordingly, the first prong of the permanent custody test is met as to both parents.
 {¶ 17} Both parents have challenged this conclusion, however. For her part, Cather claims that R.C. 2151.414(B)(1)(d) is unconstitutional, and has separately assigned this as error. We have addressed that argument and overruled it for the reason that she failed to raise the objection below.[2]
 {¶ 18} For his part, Swope contends that reliance on the fact that the child was in the temporary custody of CSB for more than 12 months as satisfaction of the first prong of the permanent custody test is patently unfair to him. This is so, he contends, because the motion for permanent custody was filed less than one year after his paternity was established.
 {¶ 19} Swope has not cited any authority in support of this proposition. Nor is this Court aware of any statutory requirement that motions for permanent custody may not be filed within one year of a determination of paternity. While we can conceive of a set of facts where a determination of paternity may come so late that there is insufficient time to reasonably prepare for a custody matter, this is not such a case. In the present matter, Swope states that paternity was established on October 29, 2001,[3] and the motion for permanent custody was filed on October 22, 2002, very nearly an entire year later. This does not constitute an insufficient amount of time in which to prepare for a custody proceeding.
 {¶ 20} Moreover, Swope was named as an alleged father in the July 19, 2001 complaint, and he personally appeared at the September 26, 2001 adjudicatory hearing with counsel. Therefore, Swope was on notice of this proceeding and the fact that he was named as an alleged father for well over a year before the motion for permanent custody was filed. Based on this record, this Court concludes that Swope's argument is without merit.
 {¶ 21} Swope also contends that R.C. 2151.414(B)(1)(d) requires that the child must be in temporary custody for 22 months before CSB may file a motion for permanent custody. However, this Court has previously indicated that R.C.2151.414(B)(1)(d) does not require that CSB wait 22 months before filing a motion for permanent custody. See In re T.B., 9th Dist. No. 21124, 2002-Ohio-5036, ¶ 23.
 {¶ 22} Having concluded that the first prong of the permanent custody test is satisfied as to Cather and Swope by the fact that the child had been in the temporary custody of CSB for more than 12 months, this Court next turns to consideration of the assertion by each of the parents that the weight of the evidence fails to support a finding that permanent custody was in the child's best interest.
 {¶ 23} In regard to a determination of whether a grant of permanent custody is in the child's best interest, the juvenile court must:
"[C]onsider all relevant factors, including, but not limited to, the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
"(5) Whether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child." R.C.2151.414(D)(1)-(5).
 {¶ 24} R.C. 2151.414(E)(11) is relevant to Cather, as it invokes consideration of the following:
"(11) The parent has had parental rights involuntarily terminated * * * with respect to a sibling of the child."
 {¶ 25} "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors."In re Smith (Jan. 2, 2002), 9th Dist. No. 20711; see, also, Inre Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.
1. The interaction and interrelationships of the child.
 {¶ 26} In regard to the interaction and interrelationships of the child, the evidence indicates that during the first three and one-half months in which the child lived with the maternal grandmother, both parents visited with the child frequently. Thereafter, the parents both participated regularly and appropriately in weekly visitation at the visitation center. Both parents also attended and completed parenting classes. The caseworker reported that it was apparent, from his observations, that they both loved the child. The maternal and paternal grandmothers also occasionally visited with the child during these weekly visitations.
 {¶ 27} The nature of the relationship that P.C. had with Swope and Cather is limited, however, by several concerns addressed by their case plans.
 {¶ 28} First, neither parent has established regular employment or adequate housing. Cather claims, with some amount of contradiction, that she has a job offer to work in a bar, but also states that she cannot get a job because of her criminal record and lack of education. Cather also indicated that her brother was going to make her a dependent, so that she could obtain military housing, benefits, and the use of his income while he was in the service.
 {¶ 29} Alternatively, Cather indicated that she would reside with her mother. This was reported to be an unsatisfactory arrangement because of safety concerns. The maternal grandmother had not provided adequate supervision in the past, and the home environment was also not adequate. The guardian ad litem, who visited the home while the child was placed there, expressed concerns regarding the condition of the home and housekeeping standards. She described the home as a one-bedroom apartment, with dirty dishes in the living room, "pens (sic) and needles" on the floor, cigarette butts on the end table, and a crib with a broken side-rail that would not lift up. Cather explained that the home was cluttered on the day of the visit by the guardian ad litem because they had just returned from doing laundry. However, that would not explain the safety-related concerns expressed by the guardian ad litem.
 {¶ 30} Swope testified that he works seasonally as a roofer and occasionally does temporary work. His income varies from $20 to $250 per week. He pays his parents $50 a month rent when he is able. He stated that his income for the last three years has ranged from $12,000 to $16,000. Swope was ordered to pay the statutory minimum of $50 child support, but was already in arrears by $333.30 at the time of the permanent custody hearing. He has lived with his parents for the last one and one-half years and has never had his own residence. Swope stated that he would continue to live with his parents if he obtained custody, until he was able to afford separate housing.
 {¶ 31} CSB expressed concern regarding the presence of the paternal grandfather in the home because he has a significant criminal history, involving drug and alcohol abuse and several DUI convictions. Swope claimed that he would utilize his mother and sister as babysitters instead, but CSB pointed out that the paternal grandmother works six to seven hours a day, five or six days a week. His sister did not testify at the permanent custody hearing.
 {¶ 32} Second, both parents were referred for anger management classes or individual counseling. The parents claimed that the requirement was irrelevant because an existing domestic violence charge had been dismissed. However, there was also testimony regarding ongoing physical altercations between Swope and Cather, bruises on Cather, and fights to which police had been called. There was certainly justification in the record for the requirement. Cather had not complied with this requirement, and Swope only recently began participation in a program addressing anger management, stating that he had "overlooked" the requirement.
 {¶ 33} Third, both Cather and Swope were to address mental health concerns. Cather was to participate in counseling for depression. She had previously been diagnosed with bi-polar disorder and a personality disorder. William Cardina, the CSB caseworker, testified Cather had engaged in a series of unstable relationships, had made poor choices in partners, and had been the victim of physical and sexual abuse. The caseworker stated his belief that Cather had ongoing mental health problems, chronic in nature.
 {¶ 34} Cather was not participating in counseling for her depression. Cather testified that she did not see "eye to eye" with the counselor at Family Solutions and did not trust her former counselor at Portage Path. The CSB caseworker allowed that Cather's distrust was somewhat justified because of a breach of confidentiality, but Cather did not request another counselor, and in fact, stated that she did not believe she needed counseling, despite her diagnoses and the fact that her case plan required it. She stated: "I feel at this time that I would rather trust God than a counselor."
 {¶ 35} Swope was required to obtain a psychological evaluation and follow the recommendations. This requirement stemmed from statements made in February 2001 by Cather's then six-year-old twins to a therapeutic counselor as part of the Portage County case. According to the therapist, the boys each independently told her that Swope had exposed himself to the boys, wanted them to touch his private parts, and to show their own. The boys also reportedly told the therapist that Swope was mean and yelled at their mother. The therapist communicated this information to CSB in April 2002 because of the potential significance to the present case. At the permanent custody hearing, Swope denied any molestation of the boys. However, an "agreement" was reportedly reached at the April 2002 hearing that a psychological assessment would be required, as opposed to a sex offender evaluation, and the requirement was then added to Swope's case plan.
 {¶ 36} Swope did not begin his psychological assessment until October 31, 2002. While the report from his assessment was not yet completed at the time of the permanent custody hearing, the diagnosis was expected to be polysubstance abuse in early full remission and adjustment disorder, not otherwise specified. The adjustment disorder was explained as a condition that would evoke a more extreme response to problems than would occur in the average person. The supervising psychologist anticipated recommendations of anger management therapy, anger management group therapy, and couple's therapy.
 {¶ 37} It is worth noting that this assessment was conducted without any input from collateral resources, such as CSB or Oriana House. Because of that, the CSB caseworker expressed concern with the manner in which the assessment was conducted.[4]
 {¶ 38} Fourth, Swope has an extensive criminal record, including two convictions each for possession of drug paraphernalia, driving under the influence, carrying a concealed weapon, driving under a suspended license, and single convictions for trafficking in marijuana, disorderly conduct, and receiving stolen property. He was incarcerated at the time of the child's birth, and also during the pendency of this proceeding.
 {¶ 39} Fifth, the May 23, 2002 amended case plan also required Swope to participate in a chemical dependency assessment. He claims he has not used marijuana since January 2001, and there is no evidence that he has. He has, however, admitted using marijuana as well as other drugs in the past. While Swope indicated his willingness to participate in another chemical dependency assessment, he did not believe it was necessary because he recently had one at Oriana House.[5]
Swope also believed the Oriana House aftercare program was optional. Both the Oriana House counselor and the CSB caseworker testified to the contrary. The Oriana House counselor testified that she recommended continuing treatment after his July 2002 release, and explained that clients who follow through with an aftercare program have a better chance of remaining clean and sober. CSB wanted Swope to participate in an assessment outside the structure of Oriana House because it would better test his personal resolve to remain sober. The CSB caseworker testified that he told Swope of the need for another assessment at the beginning of the summer of 2002. Swope did initiate another assessment, but not until mid-March 2003.
 {¶ 40} In general, Swope claims that several requirements of his case plan were not added until May 23, 2002, and that he did not receive notice of them until August 2002, when he was released from Oriana House. Such notice would be only two or three months before the motion for permanent custody was filed. As this Court has previously noted, the creation and implementation of a case plan requires the exercise of sound discretion. See In re M.W., 9th Dist. No. 03CA008342, 2004-Ohio-438, ¶ 29.
 {¶ 41} However, several factors detract from the existence of any merit in Swope's argument. First, the case plan was mailed to his home as well as to his attorney when it was filed on May 23, 2002. Furthermore, Swope admitted that he spoke to the CSB caseworker about the psychological evaluation in June 2002 while he was in Oriana House, and Swope conceded knowledge of the requirement for a chemical dependency assessment during the April 30, 2002 review hearing. Indeed, at that time, he reported that he had already made the appointment.
 {¶ 42} Second, Swope admitted to having over a year of notice of other portions of the case plan, and even those portions remained unsatisfied. Those unsatisfied requirements included: (1) anger management classes; (2) financial support of the child, upon which he was already $330 in arrears; and (3) satisfactory housing.
 {¶ 43} Third, Swope was represented by counsel throughout this proceeding. No objection was entered to the May 23, 2002 amendments to his case plan, as contemplated by statute where a party wishes to challenge case plan requirements. See R.C.2151.412(E)(2) That section provides: "All parties and the guardian ad litem shall have seven days from the date the notice [of proposed changes to the case plan] is sent to object to and request a hearing on the proposed changes." Id. Absent objection, hearing, or disapproval by the court, "the agency may implement the proposed change[.]" R.C. 2151.412(E)(2)(b).
 {¶ 44} Since there was no objection below to the timing of these amendments, and the argument does not otherwise appear to have merit, the argument is overruled.
 {¶ 45} Consideration of this factor weighs against both parents.
2. The wishes of the child.
 {¶ 46} Tony Paxton, the guardian ad litem spoke on behalf of P.C., who was less than two years old at the time of the hearing. The guardian ad litem indicated that permanent custody was in the best interest of the child. He believed that Swope and Cather both lacked the maturity to raise a child and had failed to comply with case plan objectives, leaving many concerns unaddressed.
3. Custodial history of the child.
 {¶ 47} The custodial history of the child is that she has been in the custody of CSB virtually her entire life. She was placed with the maternal grandmother for the first three and one-half months, and has resided with a foster family since November 1, 2001. She is reportedly thriving in their care, and there is very positive interaction between the child and the foster family. The foster parents are nurturing, have bonded with the child, and are interested in adopting her.
4. Child's need for a legally secure placement.
 {¶ 48} CSB established that P.C. is in need of a permanent placement, but that neither parent had demonstrated the ability to provide for the child or to provide a stable home environment. According to the CSB caseworker, little has changed since the child came into care and additional time would not be productive for either parent. Consequently, a permanent placement could only be achieved by granting permanent custody to CSB.
5. Involuntary termination of parental rights as to siblings.
 {¶ 49} The trial court was also permitted to consider, as to Cather, the fact that she had had her parental rights involuntarily terminated as to three siblings of P.C.
 {¶ 50} Given the evidence presented at the permanent custody hearing, the trial court did not err in concluding that permanent custody to CSB was in the best interest of P.C. Swope's sole assignment of error and Cather's fourth assignment of error are overruled.
 Cather's Assignment of Error Number One
"The trial court erred as a matter of law in failing to sustain appellant-father's motion to dismiss on the grounds that CSB had failed to timely file its motion for permanent custody in accordance with the statutory mandates of O.R.C. 2151.353(F) and O.R.C. 2151.415, thus divesting the trial court of jurisdiction to conduct a permanent custody hearing."
 {¶ 51} Cather contends that R.C. 2151.353(F) and R.C.2151.415(A) required CSB to file its motion for permanent custody within one year of the date on which the complaint was filed, and that CSB's failure to do so resulted in a loss of jurisdiction in the juvenile court to conduct a permanent custody hearing.
 {¶ 52} Swope raised the argument below, but Cather did not. Only Cather asserts the argument on appeal. Because the argument concerns jurisdiction, it will be addressed.
 {¶ 53} In re Young Children (1996), 76 Ohio St.3d 632, is dispositive of the question. In that case, the Ohio Supreme Court held that the "passing of the statutory time period (`sunset date') pursuant to R.C. 2151.353(F) does not divest juvenile courts of jurisdiction to enter dispositional orders." Id. at syllabus. In its opinion, the court held that where the problems which initially resulted in the temporary custody order still remained unresolved, "courts have the discretion to make a dispositional order in the best interests of the child." Id. at 638; see, also, Gunther v. Summit Cty. Children Services Bd.
(Mar. 17, 1997), 9th Dist. No. 18192.
 {¶ 54} In the present case, the problems which initially resulted in the temporary custody order remained unresolved. The trial court, therefore, had jurisdiction and retained the discretion to make a dispositional order in the best interest of the child. Cather's first assignment of error is accordingly overruled.
 Cather's Assignment of Error Number Two
"The trial court erred in granting CSB permanent custody where CSB initially failed to use reasonable efforts to reunite appellant-mother and the minor child."
 {¶ 55} Cather asserts that the trial court erred in granting CSB permanent custody of her child because CSB failed to use reasonable efforts to create and maintain a case plan that would reunify her with her child during the time from the initial removal of the child until CSB filed its first reasonable efforts bypass motion.[6] Cather argues that, during this time period, CSB failed to use any "reasonable good faith or diligent effort" to create and maintain a case plan to reunify the mother and child.
 {¶ 56} Cather first argues that, pursuant to R.C. 2151.412, CSB was required to file a case plan within thirty days of the filing of the complaint. R.C. 2151.412 (C) provides as follows:
"Each public children services agency and private child placing agency that is required by division (A) of this section to maintain a case plan shall file the case plan with the court prior to the child's adjudicatory hearing but no later than thirty days after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care."
Cather asserts that CSB did not file an initial case plan until September 26, 2001, 39 days after the time prescribed by statute. However, nothing in the record suggests that Cather objected to the untimely filing of this case plan. Certainly, Cather has not cited to any place in the record where this objection was raised in the trial court. Consequently, this Court declines to address this argument when it has been raised for the first time on appeal. See, e.g., In re Stephanie H. (Sept. 17, 1999), 6th Dist. No. H-99-009, (court of appeals declined to address argument that case plan was not filed within 30 days after shelter care hearing where appellant did not object in trial court); In re Willis (Mar. 7, 2002), 8th Dist. No. 79070, 2002, (overruling assignment of error where there was no evidence that appellant objected to case plan or to its timeliness).
 {¶ 57} Next, Cather argues that the initial case plan did not address the problems giving rise to the removal of the child. Once again, there was no timely objection to the relevance of the initial case plan, and this Court declines to address the argument for the first time on appeal.
 {¶ 58} Cather also claims that CSB provided no services in support of the case plan concerns regarding housing and parenting skills. Yet, the record indicates that Akron Metropolitan Housing Authority was prepared to work with Cather on housing, but Cather was first required to present her birth certificate. In addition, CSB referred Cather to parenting classes to address her parenting needs. Accordingly, based on the record before this Court, the argument is without merit.
 {¶ 59} Finally, Cather contends that she complied with most of her case plan requirements. It is true that Cather completed a parenting class, a drug and alcohol assessment, drug education classes, complied with her probation, and regularly and appropriately visited with her child. However, in asserting compliance with other aspects of her case plan, Cather suggests that her mother's home was satisfactory, that she was able to secure a steady income or financial assistance, that her counseling requirement should be excused because she did not believe it was needed, and that domestic violence issues are irrelevant.
 {¶ 60} Such claims are not reasonable. First, the home of Cather's mother is lacking, not simply because it was not independent, but rather because it was unsafe for a mobile infant and Cather's mother had provided inadequate supervision in the past. Second, Cather's reliance upon an unsubstantiated dependent status to her military brother for an unspecified time is, at best, a questionable "steady income." Third, an individual diagnosed with bi-polar disorder and a personality disorder, cannot, without supporting evidence, discount the need for counseling. Fourth, the dismissal of one domestic violence charge does not obviate the need to address continuing issues regarding physical altercations between Cather and Swope.
 {¶ 61} Cather's second assignment of error is accordingly overruled.
 Cather's Assignment of Error Number Three
"Ohio revised code Section 2151.419(a)(2)(E), which excuses a children services agency from making reasonable efforts at reunification, is unconstitutional as it violates a parent's substantive and procedural due process rights as guaranteed under the ohio and united states constitutions."
 Cather's Assignment of Error Number Seven
"Ohio revised code Section 2151.414(b)(1)(D) which imposes a statutory presumption of parental unfitness if a trial court finds that a child has been in the temporary custody of a children services agency for more than twelve months of a twenty-two month period, is unconstitutional as it violates a parent's substantive and procedural due process rights as guaranteed under the ohio and united states constitutions."
 Cather's Assignment of Error Number Eight
"Ohio revised code Section 2151.414(e)(11), which excuses a children services agency from making a finding that a minor child cannot or should not be placed with a parent if that parent has previously had his or her parental rights involuntarily terminated with respect to a sibling of the minor child is unconstitutional as it violates a parent's substantive and procedural due process rights as guaranteed under the ohio and united states consitutions."
 {¶ 62} In these three assignments of error, Cather asserts the unconstitutionality of three portions of the statutes related to the termination of parental rights. She challenges the following: (1) R.C. 2151.419(A)(2)(e), excusing a children services agency from making reasonable efforts to reunite a parent and child if the parent has had parental rights involuntarily terminated with respect to a sibling of the child; (2) R.C. 2151.414(B)(1)(d), satisfying the first prong of the permanent custody test where a child has been in the temporary custody of a children services agency for more than 12 months of the prior 22 months; (3) R.C. 2151.414(E)(11), mandating a finding that a child cannot or should not be placed with a parent within a reasonable time when the parent has had parental rights involuntarily terminated with respect to a sibling of the child.
 {¶ 63} Cather entered no objection to the constitutionality of these provisions in the trial court, and this Court will not consider the questions for the first time on appeal. State v.Awan (1986), 22 Ohio St.3d 120, syllabus; see, also, In reC.F., 9th Dist. No. 02CA008084, 2002-Ohio-6113, at ¶ 37-38.
 Cather's Assignment of Error Number Five
"The trial court's decision denying appellant-father's motion for a six month extension of temporary custody and/or father's motion for legal custody was contrary to law, against the manifest weight of the evidence and/or an abuse of discretion."
 {¶ 64} Cather challenges the denial of Swope's motion for a six-month extension of temporary custody and the denial of his motion for legal custody.
 {¶ 65} As to the former, the trial court found that the evidence did not establish that an extension was in the best interest of the child, that there had been significant progress on the case plan, or that there was reasonable cause to believe that the child would be reunified with one of the parents within the period of the extension. The trial court did not abuse its discretion in so ruling. The argument is, therefore, without merit.
 {¶ 66} As to the denial of Swope's motion for legal custody, the trial court was not required to rule out the option of legal custody to Swope before awarding permanent custody of P.C. to CSB. Although the trial court has discretion to award legal custody to either parent or any other person who files a motion for legal custody, a request for legal custody "does not alter what a court considers in determining permanent custody." In rePatterson (1999), 134 Ohio App.3d 119-129, citing In re Mastin
(Dec. 17, 1997), 9th Dist. Nos. 97CA006743 and 97CA006746; see, also, In re Dye (Apr. 19, 1995), 9th Dist. Nos. 16927 and 16932, at 5.
 {¶ 67} It was within the trial court's discretion to determine whether to place P.C. with Swope. A reviewing court will not reverse the judgment of a juvenile court absent an abuse of discretion. Patterson, 134 Ohio App.3d at 130, citing In rePieper Children (1993), 85 Ohio App.3d 318, 330. To constitute an abuse of discretion, a trial court's action must have been arbitrary, unreasonable, or unconscionable. State ex rel. The V.Cos. v. Marshall (1998), 81 Ohio St.3d 467, 469. The trial court examined all of the evidence and determined that placing P.C. with Swope was not in the best interest of the child. This Court does not find that the trial court's actions were arbitrary, unreasonable, or unconscionable.
 {¶ 68} Accordingly, Cather's fifth assignment of error is overruled.
 Cather's Assignment of Error Number Six
"The trial court's decision terminating appellant mother's parental rights must be reversed based upon mother receiving prejudicial ineffective assistance of trial counsel."
 {¶ 69} In this assignment of error, Cather asserts her trial attorney was ineffective for failing to attend three hearings, and failing to challenge the unconstitutionality of the statutory provisions cited in her third, seventh, and eighth assignments of error.
 {¶ 70} The test for ineffective assistance of counsel is the same in permanent custody cases as it is in criminal cases.Jones v. Lucas Cty. Children Services Bd. (1988),46 Ohio App.3d 85, 86. The Supreme Court of Ohio has held that courts should apply a two-part test to determine ineffective assistance claims. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. First, the appellant must show that counsel's performance fell below an objective standard of reasonable representation. Id. Second, even if counsel's performance fell below an objective standard of reasonable representation, the court should not reverse unless counsel's ineffectiveness resulted in prejudice. Id. In order to show prejudice, warranting reversal, there must be a reasonable probability that, but for employee's ineffectiveness, the outcome of the proceeding would have been different. Id., quoting Strickland v. Washington (1984), 466 U.S. 668, 694,80 L.Ed.2d 674.
 {¶ 71} To the extent that Cather asserts ineffective assistance of trial counsel for failing to challenge the constitutionality of the referenced statutory provisions, this Court overrules the argument. Cather has not referred us to any case that has held any of these provisions to be unconstitutional, nor is this Court aware of any. Therefore, we conclude that trial counsel's failure to object to the challenged provisions did not fall below an objective standard of reasonableness. This Court rejects Cather's claim of ineffective assistance on this basis.
 {¶ 72} This Court next considers Cather's claim of ineffective assistance in regard to the failure of trial counsel to attend court hearings. While Cather may be able to show that her trial counsel's performance was deficient by not appearing for hearings, she is unable to show that she was prejudiced by the deficiency. In demonstrating prejudice, the parent must prove that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. Bradley, 42 Ohio St.3d at paragraph three of the syllabus.
 {¶ 73} Cather contends on appeal, that if her trial counsel had attended the hearings, the juvenile court may have been more likely to amend the case plan regarding the claimed irrelevancy of requirements regarding compliance with probation rules, parenting classes, and counseling for both domestic violence and mental health issues. However, Cather presents no evidence to support this contention and therefore fails to establish a reasonable probability that the proceedings would have been different but for her attorney's failure to appear. See In reFanizzi (Oct. 30, 1996), 9th Dist. No. 17706, at 9.
 {¶ 74} In fact, the evidence in the present case established that Cather complied with the rules of her probation and completed the recommended parenting classes. As to the counseling requirements for domestic violence or mental health issues, the record supports a finding that such requirements were necessary and appropriate. Accordingly, Cather has failed to demonstrate that counsel's arguably deficient performance deprived her of a fair trial or resulted in an outcome which was not reliable in determining the best interest of her child. Cather's sixth assignment of error is overruled.
 III {¶ 75} Swope's sole assignment of error is overruled. Cather's eight assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
Slaby, J., Concurs.
Carr, P.J., Concurs in judgment only.
[1] In her appellate brief, Cather has questioned case plan language that she should obtain "independent" housing. The CSB caseworker testified that her housing did not need to be independent, and it was more important that her housing would be stable. This Court would agree. See, e.g., Moore v. EastCleveland (1977), 431 U.S. 494, 506, 52 L.Ed.3d 531 (recognizing the right of non-nuclear relatives to choose to live together as a family). The lack of "independent" housing, per se, does not form any necessary part of the trial court's decision in the present case. Rather, the goal was safe and stable housing.
[2] See discussion at Cather's Assignment of Error Number Seven, infra.
[3] The trial court order so finding was filed on November 1, 2001.
[4] The records from Oriana House would have included the fact that, while there, Swope expressed suicidal thoughts and was taken to Portage Path Behavioral Health Center's emergency facility. However, he did not complete the intake procedure, refused services, and was released back to Oriana House.
[5] Based on that assessment, the counselor at Oriana House recommended a diagnosis of alcohol and cannabis dependency.
[6] Later in her supporting argument, Cather complains that CSB failed to make efforts toward reunification after CSB filed its first reasonable efforts bypass motion. However, Cather's appellate brief specifically limits this assignment of error to the "time frame between July 19, 2001, when the minor child was removed from mother's care and February 21, 2002, when CSB filed their first reasonable efforts bypass motion." Consequently, by the terms set by this appellant, we find her argument regarding a lack of reasonable efforts after February 21, 2001, to be without merit.