DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Deborah Yannick, appeals from the judgment of the Lorain County Court of Common Pleas, Juvenile Division, terminating her parental rights to her minor child, V.C., and granting permanent custody of the child to the Lorain County Children Services ("LCCS"). We affirm.
 {¶ 2} Appellant and Ariel Torres are the natural parents of V.Y., who was born on July 5, 1997. Torres did not participate in the action below and is not a party to the present appeal. LCCS initially became involved with the family in July 2001, upon concerns regarding a lack of supervision when a younger sibling[1] was bitten by V.Y. At that time, Appellant signed a safety plan, agreeing not to leave the children in the care of maternal grandfather or maternal great-grandmother, with whom she lived.
 {¶ 3} Thereafter, on November 9, 2001, the children were removed from the home when Appellant was again found to have left the children improperly supervised and unsafe. The children were left with maternal grandfather, who was asleep with a hangover; maternal great-grandmother, who was elderly, uses a walker, and cannot hear well; and maternal aunt, who has her own history with LCCS concerning the care of her own children. The home was filled with smoke from an oven that had been left on and a pan of hot grease was accessible to the children. The home was unsanitary, with plates of old food and two bags of trash on the floor. Maternal aunt said that Appellant did not ask her to care for her children, but just left the home. She reported that Appellant often did that.
 {¶ 4} On January 24, 2002, V.Y. was adjudicated neglected and dependent, and was placed in the temporary custody of LCCS. The child remained in the temporary custody of LCCS except for a brief period when Jason May, a relative, unsuccessfully attempted to care for the child.
 {¶ 5} A case plan was developed, which addressed concerns of inadequate supervision, inappropriate discipline, domestic violence, criminal involvement, depression and questions of mental instability, lack of stable employment, and lack of independent housing. The case plan required Appellant to: (1) participate in a parenting program and provide appropriate supervision and discipline to her children; (2) participate in a domestic violence assessment and participate in support groups as recommended; (3) comply with the orders of her probation from a theft conviction; (4) obtain a stable source of income and practice budgeting skills, in order to obtain independent housing; (5) complete a substance abuse assessment and maintain a sober lifestyle; (6) complete a psychiatric/psychological assessment for depression and follow recommended treatments; and (7) participate in visitation with her children.
 {¶ 6} On March 11, 2003, LCCS moved for permanent custody. Following a hearing, the trial court granted permanent custody to LCCS and terminated Appellant's parental rights. Appellant has timely appealed and assigned one error for review.
 ASSIGNMENT OF ERROR
"The trial court erred to the prejudice of Appellant and in violation of O.R.C. 2151.414, the Fourteenth and Ninth Amendments to the United States Constitution, and Article I, Section 1 of the Ohio Constitution, when it terminated the parental rights of Appellant and granted permanent custody of the minor child to Lorain County Children Services, where the evidence failed to satisfy the requisite standard of proof."
 {¶ 7} In her sole assignment of error, Appellant contends that the weight of the evidence fails to clearly and convincingly support the judgment of the trial court. We find Appellant's argument to be without merit.
 {¶ 8} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In reOzmun (Apr. 14, 1999), 9th Dist. No. 18983, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 9} Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
 {¶ 10} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C.2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 98.
 {¶ 11} In regard to the first prong of the permanent custody test, the trial court made two findings. The trial court found that the child had been in the temporary custody of LCCS for more than 12 months of the prior 22-month period, and also found that the child cannot be placed with either of her parents within a reasonable time or should not be placed with her parents. See R.C. 2151.414(B)(1)(d) and R.C. 2151.414(B)(1)(a). Because the record supports a finding that the child was in the temporary custody of LCCS for more than 12 of the 22-months prior to the filing of the motion for permanent custody, and Appellant has not challenged that finding, we need not address the question of whether the child cannot or should not be placed with either of her parents within a reasonable time. In re Fox (Sept. 27, 2000), 9th Dist. Nos. 00CA0038-00CA0041, at 11. Accordingly, the first prong of the permanent custody test is satisfied.
 {¶ 12} Next, we consider the second prong of the permanent custody test and Appellant's assertion that the weight of the evidence fails to support a finding that permanent custody was in the best interest of the child.
 {¶ 13} In order to determine whether a grant of permanent custody is in the child's best interest, the juvenile court must:
"[C]onsider all relevant factors, including, but not limited to, the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4)[2]
 {¶ 14} "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, 2002-Ohio-34, at 6; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 15} In regard to the interaction and interrelationships of the child, the evidence indicates that Appellant visited regularly with V.Y. The maternal grandfather, maternal great-grandmother, and aunt also visited her. She is currently placed with the paternal grandparents and doing well with them. Appellant stated that she always brought food to her child when she visited. She stated that she would color, read books, play, and talk with V.Y. She would kiss and hug her child. She stated that she had kept V.Y. current on her medical appointments and shots. She testified that she loves her daughter and wants her back.
 {¶ 16} Nicole Richardson, Appellant's friend of ten years, testified in support that Appellant had very good interactions with her children. She stated that Appellant disciplined by explaining what the children did wrong and used time-outs if necessary. However, she also testified that prior to one visit in the past week, the last time she saw Appellant with her children was two years earlier.
 {¶ 17} Rebecca Sigal, an outreach worker for Catholic Charities, also testified on behalf of Appellant. She supervised four or five visitations in the fall of 2002, pursuant to a contract with LCCS. Following those visits, she would meet with Appellant to provide additional guidance. She said that Appellant and V.Y. were always glad to see each other and that the visits went very well. She stated that there always seemed to be a lot of loving. Appellant asked V.Y. questions about school and activities. Sigal did not observe any temper tantrums or behavioral problems in V.Y. While Sigal had lengthy work experience with Catholic Charities and was currently working as an outreach worker, she testified that she was filling in as an in-home support giver and had no training or education in the field.
 {¶ 18} On behalf of LCCS, however, Monica Carrion, the LCCS caseworker, expressed serious concerns regarding Appellant's ability to parent V.Y. According to Carrion, despite Appellant's completion of parenting classes, she exhibited no improvement in her response to her children. In fact, during the course of these proceedings, it was deemed necessary to reduce visitations from one and one-half hours to one hour per week, and to change the status from monitored to supervised, because V.Y.'s behavior and Appellant's responses were getting worse.
 {¶ 19} Carrion stated that while Appellant brought food and gifts to her child, there was no emotional connection. She testified that there was little bond between mother and child, and despite the fact that V.Y. longed for a relationship with her mother, she was more apt to cling to her aunt or grandfather.
 {¶ 20} Carrion also expressed concern that Appellant did not take a mature approach to parenting. Appellant would ignore V.Y. or say something that would make the child angry or upset. V.Y. would then get very upset and aggressive towards Appellant: punching, spitting, or throwing shoes at her. Appellant would laugh at the child, and fail to acknowledge her feelings. V.Y. would get more aggravated, to the point that her safety was put in jeopardy.
 {¶ 21} Carrion felt that Appellant's failure to attend to her mental health issues resulted in a lack of benefit from the parenting classes. Appellant participated in a psychological assessment and a substance abuse assessment, but failed to follow through with recommended counseling. Appellant was referred to three different providers for counseling services. Two of the agencies eventually cancelled her involvement because of lack of attendance and Appellant attended the third only sporadically. For her part, Appellant complained that the counselors did not seem to know why she was there and seldom focused on her school, her children, or relevant matters.
 {¶ 22} Two therapists testified on behalf of LCCS. First, Danielle Soltis testified that she conducted a psychological evaluation of Appellant to determine her mental health status and whether she was capable of caring for a child. She stated that Appellant was financially and emotionally unstable. She noted Appellant's problems regarding the law, caring for her child, and maintaining consistency in terms of employment and counseling. Soltis diagnosed Appellant with narcissistic personality disorder. She explained that such individuals have difficulty with consistency, putting a child's needs before their own, and being able to accept assistance and incorporate information. Soltis recommended extended therapy for Appellant and possibly medication. She believed the likelihood of success by Appellant, even with services, was poor because of her history and her difficulty in following through with recommendations.
 {¶ 23} Soltis also worked with V.Y. regarding the anger she felt towards her mother and the resultant behaviors. V.Y. was reported to have engaged in frequent temper tantrums, had difficulty following directions, and had problems in attaching to foster families.
 {¶ 24} Next, Marianne Myers, testified that she attempted to address Appellant's depression, and her need for consistency, anger management, and stability in terms of employment and housing. On September 22, 2003, however, Myers terminated services because she was "unable to engage" Appellant in services. Appellant did not feel she had anything to work on and, therefore, the therapist could not help her. Myers stated that Appellant's doctor prescribed medication for depression, but Appellant did not believe she needed it and therefore refused to take it.
 {¶ 25} Appellant's case plan also addressed the fact that she was on probation for a theft offense, having stolen a check from her grandmother. During the course of this proceeding, Appellant violated the terms of her probation and pled guilty to a second theft offense. Despite the fact that Appellant will not be sentenced to a prison term, she has not complied with the terms of her probation or the requirements of her case plan.
 {¶ 26} In regard to housing, Appellant testified that she and her children lived with her grandmother, her father, her sister and her sister's two children in a five bedroom, two bath home, owned by her grandmother. Appellant apparently believed the situation was satisfactory, but the evidence suggests it was unhealthy for several reasons. Appellant's father was a chronic alcoholic and, according to the caseworker, Appellant had a "very disturbed" relationship with her grandmother. Appellant continuously argued with her grandmother and frequently belittled her. In addition, Appellant was required to share a bedroom with her children, and engaged in inappropriate sexual activity in front of V.Y.
 {¶ 27} Appellant's probation officer expressed his concern regarding the father's alcoholism and the grandmother's instability. Soltis believed that the home environment was chaotic and detrimental to the child. Carrion stated that V.Y. requires one-on-one attention and more structure than this home permitted. While Appellant maintained that she would use a friend as a babysitter, she nevertheless believed her grandmother was capable of watching her children. LCCS had already intervened twice because of inappropriate supervision, under conditions that placed the children at risk.
 {¶ 28} Because of concerns regarding housing, Appellant's case plan required that she obtain a stable source of income and obtain satisfactory housing. Appellant had four different jobs during the course of these proceedings, and none lasted more than three months. Appellant testified that she supported herself instead on a Pell Grant of $657 per month, which she used to attend the Ohio Business College. However, Appellant was out of school for two academic quarters because of another pregnancy.
 {¶ 29} Because of her father's alcoholism, Appellant was required to complete a drug and alcohol assessment and then attend an Al-a-non support group. Appellant attended only two sessions, and then stopped because she believed the program was more relevant to spouses.
 {¶ 30} Evidence of continued danger to the children stemming from domestic violence was also presented. Appellant had been a victim of domestic violence by the father of her second child. He was prosecuted for that offense. However, during a recent visit, he again struck her as well as the new baby in her arms. The caseworker also stated that Appellant has a history of making poor choices regarding men.
 {¶ 31} In her appellate brief, Appellant complains that too much attention was placed on compliance with the case plan and that evidence regarding the best interest of the child was lacking. However, the nature of the relationship between a parent and child may certainly be affected by the concerns presented by the case plan and the parent's success in addressing those concerns. See In re P.C., 9th Dist. Nos. 21734 and 21739, 2004-Ohio-1230, at ¶ 27. In this case, evidence regarding relationships and interrelationships of the child does not weigh in favor of a safe, stable, and healthy relationship with Appellant.
 {¶ 32} The guardian ad litem stated in court that she would rely upon her written report in which she had indicated her view that the best interest of the child was to terminate parental rights. She observed that Appellant had not completed her case plan. Appellant had not fully addressed her mental health issues and was not able to protect her child from domestic violence. She still lived with an alcoholic father and a grandmother who was not capable of taking care of children. She has a poor record of selecting men and her continuing theft charges are a concern.
 {¶ 33} The custodial history of the child is that V.Y. resided with Appellant until November 9, 2001, when she was four years of age, at which time she entered the temporary custody of LCCS. She has not resided with her mother since that time. Two placements ended because of an inability to deal with V.Y.'s verbally and physically aggressive behaviors, and a relative placement ended because of concerns regarding Appellant's continuing involvement and harassment of the caregivers. Visitations by Appellant have not progressed well. They have been shortened in length and have required an increase in the level of supervision.
 {¶ 34} In regard to the fourth factor, LCCS presented evidence that V.Y. needs permanency and that permanent custody is in the child's best interest. V.Y. had been in counseling to address concerns regarding aggression and poor socialization skills. She did well when she was with a quality care-giver, however, she is in her fifth placement. Evidence was presented that the child requires stability, affection, and emotional bonding.
 {¶ 35} LCCS presented evidence that Appellant has not made adequate progress on the concerns expressed in her case plan to justify reunification with her daughter. The caseworker testified that Appellant is not ready to provide adequate supervision and discipline for her child. By incurring another theft conviction, she has not dealt properly with her legal situation. Housing has not been addressed. Appellant's attendance in programs to which she was referred was sporadic and she does not appear to have benefited from those she has attended. Aside from participating in visitation, Appellant has not demonstrated a commitment to her daughter.
 {¶ 36} Given the evidence presented at the permanent custody hearing, the trial court did not err in concluding that permanent custody to LCCS was in the best interest of V.Y. Appellant's sole assignment of error is overruled.
 {¶ 37} Finding Appellant's assignment of error to be without merit, the judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
Baird, J., concurs.
[1] This sibling, born of a different father, was also taken into temporary custody by LCCS and was eventually placed with his paternal grandparents. His custodial status is not at issue in the present case.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.