DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellants Melvin S. and Yokendra B. each appeal from the decision of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their minor children, and placed the children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Yokendra is the mother of four children: E.B, born April 6, 1998; Z.S., born September 21, 1999; A.S., born October 11, 2001; and Ah.S., born September 14, 2002. Melvin is the biological father of the three youngest children: Z.S., A.S., and Ah.S. Paternity of E.B. was not established.[1] Yokendra and Melvin each appeal separately from the judgment of the trial court. Yokendra challenges the judgment of the trial court as to all four children, while Melvin challenges the judgment as to his three biological children.
 {¶ 3} All four children were removed from Yokendra's home on June 4, 2003 by the Akron police pursuant to Juv.R. 6 because of the conditions in the home. The house was said to be unclean, hazardous, and there was no food to eat. CSB filed a complaint the next day, alleging that the children were neglected and dependent and seeking emergency temporary custody.
 {¶ 4} According to CSB, neither parent had been providing for the basic needs of the children. The children had been living with Yokendra, and CSB had been working with her for two months, but Yokendra was not utilizing services to assist the family. Melvin had also failed to provide for the children, due to a six-month incarceration for domestic violence.
 {¶ 5} Over the course of those two months, CSB claimed there was often no food in the home. The CSB caseworker visited the home on the morning of the day the children were removed. At that time, the caseworker found that there again was no food in the home, the house smelled strongly of urine, and the toilet did not work. The children were picking up cereal from the floor to eat. Clothing was piled everywhere, including on the beds, leaving the children without a proper place to sleep. The children needed to be bathed and were wearing dirty clothing. The caseworker advised Yokendra to clean the house, and indicated that she would return later in the day. Upon her return, the house was in the same condition. CSB also alleged that Yokendra had not taken infant Ah.S. to the doctor for a cold, despite three weeks of urging by CSB. CSB expressed concerns regarding Yokendra's mental health and possible drug use.
 {¶ 6} The trial court granted an order of emergency temporary custody, and the case proceeded to adjudication. On July 24, 2003, the trial court adjudicated all four children to be dependent and neglected. The court found that the parents neglected or refused to provide for the basic needs of the children, including education, medical care, food, a safe environment, and basic provisions for hygiene. Yokendra admitted leaving the two youngest children home alone while walking the older two children to school. The court also found that Yokendra was often without diapers and food. The parties agreed to place the children in the temporary custody of CSB.
 {¶ 7} The trial court adopted a case plan. The plan required Yokendra to: (1) participate in assessments for substance abuse and mental health; (2) obtain suitable housing; (3) establish stable employment; and (4) learn and utilize budgeting skills. Melvin's case plan objectives required him to: (1) establish stable employment; (2) participate in parenting classes; (3) refrain from domestically violent relationships and participate in a program targeted at learning the effects of domestic violence on children.
 {¶ 8} In addition, both parents were required to: (1) maintain an active relationship with their children through regular visitation and by interacting appropriately with the children; (2) work with the CSB worker to learn about the children's basic needs and meet case plan objectives; and (3) participate in developmental assessments and treatment for Ah.S. and A.S.
 {¶ 9} Melvin initially made very good progress on his case plan. He had obtained appropriate housing and ample furnishings and supplies for the children. He maintained employment, and began attending parenting classes and a domestic violence class. He was said to have consistently and appropriately visited with the children. Yokendra's progress on her case plan, however, was much less satisfactory. In fact, she lost her home, failed to maintain regular contact with CSB, and was not visiting with the children. Because of Melvin's progress on his case plan and the positive recommendation of CSB, on March 23, 2004, the trial court placed all four children in Melvin's legal custody under the protective supervision of CSB. Yokendra was permitted to have visitation as agreed by the parties.
 {¶ 10} Within two months, the police were called to Melvin's home with reports of a fight. Yokendra had gone to the home to visit with the children. Melvin reportedly made advances to Yokendra, and when she resisted, a fight ensued. Yokendra sustained visible injuries to her forehead. The fight moved outside, and a neighbor came over to the home. Melvin punched the neighbor in the face and left the scene. When Melvin returned, he appeared to be intoxicated and resisted arrest. He was charged with domestic violence and obstruction of justice. The children were removed from Melvin's home by the Akron police pursuant to Juv.R. 6.
 {¶ 11} As a result of Melvin's behavior and his inability to provide for the children at that time, CSB sought to have the children returned to temporary custody and also sought a first six-month extension. CSB claimed that, despite Melvin's compliance with case plan objectives, he continued to perpetrate domestic violence in the home of the children, placing them at risk of physical and emotional harm. The CSB caseworker reported no recent contact with Yokendra. The trial court granted the motion for an extension and returned the children to the temporary custody of CSB. In an effort to address Melvin's parenting skills and domestic violence issues, CSB filed an amended plan which included a mental health evaluation and a drug and alcohol assessment for him.
 {¶ 12} In November 2004, CSB moved for a second six-month extension, seeking time to pursue a legally secure placement. The current caregivers had decided not to pursue legal custody, and other relatives were being assessed. The agency indicated that Melvin had maintained housing and employment, but otherwise had significantly declined in his case plan compliance efforts. His visits with the children had become irregular and he had not completed his parenting classes or counseling. The agency also indicated that it had had no contact with Yokendra, and she had not visited with the children since May 2004. The trial court granted the second six-month extension.
 {¶ 13} On May 24, 2005, CSB moved for permanent custody of the children. Melvin and Yokendra each moved for legal custody, and Yokendra also moved to place the children with relatives or in a planned permanent living arrangement ("PPLA"). Following a hearing, the trial court found that the children had been in the temporary custody of CSB for at least 12 of the prior 22 months, and that permanent custody was in the best interests of the children. The trial court, therefore, terminated the parental rights of Melvin and Yokendra, and placed all four children in the permanent custody of CSB. The trial court denied all other dispositive motions.
 {¶ 14} Each parent appealed, and each assigned a single error for review. Because the assignments of error are related, they will be addressed together.
 MELVIN'S ASSIGNMENT OF ERROR
"THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY OF A.S., Z.S. AND A.S. TO SUMMIT COUNTY CHILDREN SERVICES BECAUSE THE CHILDREN COULD NOT BE PLACED WITH THEIR FATHER WITHIN A REASONABLE TIME WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE CHILDREN'S BEST INTEREST."
 YOKENDRA'S ASSIGNMENT OF ERROR
"THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY IS NOT SUPPORTED BY SUFFICIENT CREDIBLE EVIDENCE MEETING THE BURDEN OF CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF EACH OF THE CHILDREN."
 {¶ 15} In his sole assignment of error, Melvin contends that the weight of the evidence fails to support an award of permanent custody to CSB. In addressing the best interest portion of the permanent custody test, he contends that the evidence demonstrates the existence of a bond between him and his children, as well as a degree of compliance with his case plan objectives.
 {¶ 16} In her sole assignment of error, Yokendra argues that there was insufficient evidence before the trial court to support a finding by clear and convincing evidence that permanent custody is in the best interests of the children. Specifically, she contends that the evidence presented on the best interest factors did not relate to her. She asserts that there is a loving bond between her and the children, among the children themselves, and between the caregivers and the children. She argues that the trial court should have granted legal custody to a relative instead of terminating her parental rights.
 {¶ 17} Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C.2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 97-99.
 {¶ 18} The trial court found that the first prong of the permanent custody test was satisfied because all four children had been in the temporary custody of CSB for at least 12 of the prior 22 months. Neither parent contests that finding. Yokendra and Melvin challenge only the best interest prong of the permanent custody test. Melvin contends that the trial court's best interest finding was against the manifest weight of the evidence, and Yokendra contends that the trial court's finding was not supported by sufficient evidence.
 {¶ 19} A review of the sufficiency of the evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citingState v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook J., concurring). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the agency. See State v. Jenks (1991), 61 Ohio St.3d 259, 279.
 {¶ 20} When reviewing the weight of the evidence, this Court applies the same test in civil cases as it does in criminal cases. Tewarson v. Simon (2001), 141 Ohio App.3d 103, 115. "The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Alterations sic). Id., citing Thompkins,78 Ohio St. 3d at 387, quoting State v. Martin (1983),20 Ohio App. 3d 172, 175.
 {¶ 21} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[2]
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith
(Jan. 2, 2002), 9th Dist. No. 20711; see, also, In rePalladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 22} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 23} The first best interest factor requires the court to consider the children's interactions and interrelationships with others. The four children are very closely bonded with each other and enjoy being together. At visits, they interact well together. The guardian ad litem stated that it would be in the best interests of the children to maintain their relationships with each other.
 {¶ 24} Winona Riddle, the guardian ad litem, offered a description of each of the children. She said E.B. was an active and typical seven-year old who likes sports and is doing well in school. He enjoys playing football with his uncle and cousins (the Jones family) with whom he is currently placed. Z.S. is an outgoing six-year old, who likes sports and loves school. A.S. is a four-year old, who is a bit ornery, but is a typical girl who likes dolls and getting dressed up. She is in Head Start and is on track. Ah.S. is a three-year-old boy, who was far behind in both verbal and motor skills. Since he entered his new placement and some medical problems were discovered, he has made great strides developmentally.
 {¶ 25} All of the children have special needs. Two of the children, E.B. and Z.S., have been diagnosed with attention deficit hyperactivity disorder and adjustment disorders, not otherwise specified. E.B. and Z.S. have had problems due to their separation from Yokendra and Melvin, and due to the several other placement changes. E.B. has exhibited behavioral problems as well as academic problems in school and is scheduled for a developmental assessment. Z.S. and A.S. have both exhibited some sexual acting-out behaviors. Ah.S. has speech delays and is in speech therapy. The three oldest children, E.B., Z.S., and A.S., have been referred for counseling.
 {¶ 26} The guardian ad litem described the children as being happy to see Melvin at visits, and said the children seemed to be bonded to him. The children and Melvin each showed affection to each other. Typically, Melvin would sit and call the children to come to him one at a time and talk about school and their activities. He would also read to them. The social service aide testified that Melvin did well one-on-one, but had difficulty keeping track of all four children during visits. According to the guardian ad litem and the social service aide, Melvin's supervision was not very good, and he left most of those duties to the aide. The aide also pointed out that Melvin had not prepared a child care plan for his working hours, as requested.
 {¶ 27} There was little evidence regarding Yokendra's relationship with the children, and Yokendra points to this lack of evidence as an indication that CSB had not met its burden of proof in this matter. There was little evidence of Yokendra's relationship with her children, however, largely because she had not visited with them for almost a year, did not often visit with them before that, and maintained little relationship with CSB. Yokendra argues on appeal that she visited with her children regularly until she was incarcerated on a misdemeanor conviction, for which she expected to be released before Thanksgiving 2005. At the hearing, Yokendra testified that she had not visited with the children because she was homeless.
 {¶ 28} The evidence in the record indicates that Yokendra had not visited with the children from November 2004 until the time of the permanent custody hearing in the fall of 2005, nearly a year. The social service aide who supervised Yokendra's visits in the fall of 2004 testified that the children were happy to see her and vied for her attention. The visits were said to be loving, but were also unstructured and undisciplined. Yokendra usually arrived late for the visits. For her part, Yokendra testified that she loves her children and misses them. She asserts that she now is employed and will live with a friend upon her release from jail. She believes that being in jail has helped her to refocus her life, and states that she is committed to taking care of the children given the opportunity.
 {¶ 29} All of the children have a very positive relationship with Nichie and Juan Jones and their three boys, paternal relatives with whom the oldest three children have been placed during a large part of this case. The guardian ad litem testified that A.S., Z.S., and E.B. interact as one big family with their three cousins and their Aunt Nichie and Uncle Juan, as the children call them. The Joneses completed foster training and became foster parents to the children. The guardian ad litem stated that the children are doing very well in this foster home and that the foster parents are willing to adopt the three children.
 {¶ 30} Ah.S. was also placed with the Jones family for a while, but was moved to a separate foster home because of his developmental needs. Nevertheless, all four children share a baby-sitter and are able to frequently visit together. Ah.S. has made great strides while in foster care, and his foster parents are interested in adopting him as well. All four children are said to be well bonded with their respective caregivers and happy in their situations.
 {¶ 31} Juan Jones testified that he initially took the children in because he did not want the children separated and wanted to keep them in the family. His wife is a cousin to Melvin. He indicated that the children were somewhat unruly when they first arrived, but have improved over time as they adjusted and "healed." He described his home as fairly structured, and explained that the children must do their homework and clean up after themselves before they can watch television or play. He also explained that if the children misbehave, he has them sit with him and they are not allowed to play with the other children. He stated that he would be willing to help if the children were placed with Melvin. He also indicated that the members of Melvin's extended family were helpful and supportive.
 {¶ 32} This Court has previously indicated that a parent's success in addressing the concerns expressed in a case plan may be relevant to the nature of the relationship between the parents and children. See In re V.Y., 9th Dist. No. 03CA008404,2004-Ohio-1606, at ¶ 31, citing In re P.C., 9th Dist. Nos. 21734 and 12739, 2004-Ohio-1230, at ¶ 27. Therefore, the parents' efforts regarding their case plan objectives will be considered.
 {¶ 33} After the children were removed from their placement with Melvin, Melvin was asked to participate in a parenting assessment. Dr. Lynn Luna of Summit Psychological Associates diagnosed Melvin with intelligence bordering on mental retardation, antisocial personality disorder, and a history of alcohol dependence and cannabis abuse. She expressed concern with Melvin's ability to parent the children if they had special needs. She recommended that Melvin successfully complete parenting classes, individual counseling, substance abuse treatment, develop a plan for child care during his work hours, and obtain a neurological assessment to rule out organic causes for the intellectual impairments displayed in testing before the children would be returned to his care. She could not estimate how long it would be before that might be possible.
 {¶ 34} As indicated above, Melvin was initially motivated to work on his case plan and got off to a good start. However, after the incident of domestic violence in May 2004, the degree of Melvin's compliance with case plan objectives declined significantly. He has good family support from extended family members, and apparently has adequate housing, although he has not made his home available to the caseworker for several months. He participated well in his parenting classes, but completed only 18 of the 24 classes in the series. Katherine Klie, Executive Director of St. Joseph Parenting Center, indicated that Melvin did not understand the importance of having his own life in order for his children. She did not believe that Melvin could parent the children independently, but would need a great deal of support. The caseworker was concerned that after more than two years, Melvin had not been able to complete the series of parenting classes, and that he was still not able to demonstrate that he was capable of parenting his children.
 {¶ 35} Melvin also failed to complete the recommended neurological evaluation. He has not completed counseling for substance abuse or anger management. Sharon Lewis of Minority Health Counseling testified that Melvin had yet to learn socially acceptable ways of dealing with his anger. Melvin's probation officer testified that Melvin was always respectful, kept his appointments, and paid child support, but the record also demonstrates that Melvin has at least two convictions for domestic violence. The caseworker felt that Melvin's history of domestic violence created a risk in placing the young children with him.
 {¶ 36} While Melvin argues that he has maintained his sobriety, the caseworker stated that Melvin did not make himself available to provide the random drug screens recommended following his substance abuse assessment. Melvin failed to return the caseworker's phone calls, was not present for scheduled appointments, and did not respond to cards that she left at his home so that drug tests could be scheduled. Moreover, Melvin failed to complete requested paperwork so that Ah.S. could transition from Help Me Grow to Early Intervention, and also failed to provide a childcare plan for his work hours.
 {¶ 37} Melvin had weekly visitation with the children during a portion of these proceedings, but it was changed to biweekly when he could not keep up with that schedule. He also had an open-door visitation policy while the children were placed with the Jones family, but he seldom took advantage of that. According to Juan Jones, Melvin's visits were irregular and approximately once per month.
 {¶ 38} As to Yokendra, she testified that she had received her case plan and reviewed it with the caseworker early on, yet she had had no contact with either CSB or her children for close to a year. She never contacted CSB or the caregivers to inquire about the children. Caseworker Lakesha Brock testified that Yokendra had not complied with case plan objectives regarding parenting classes, substance abuse, or mental health. She had pled guilty to forgery and theft, and there was a capias warrant outstanding for her arrest at the time of the hearing in this matter.
 {¶ 39} Second, the guardian ad litem expressed her belief that permanent custody was in the best interests of the minor children. The oldest child, E.B., expressed a desire to live with the Jones family permanently. The rest of the children have not expressed an opinion on custody, but, as found by the trial court, were well bonded to both Melvin and their respective caregivers.
 {¶ 40} Third, the custodial history of the children reflects that all four children were removed from Yokendra's home on June 4, 2003. They were placed in the legal custody of Melvin on March 23, 2004 and removed from his care on May 19, 2004. With the exception of that nearly two-month period, the children have been in the custody of CSB for approximately two years. Moreover, pursuant to R.C. 2151.414(B)(1)(d), the children have been in the temporary custody of CSB for more than 12 of the previous 22 consecutive months.
 {¶ 41} The children were placed with Donita Thompson, a paternal relative, for a short period of time, but were removed because she could not financially manage to keep them. For much of the rest of the time that the children remained in temporary custody, the three oldest children, E.B., Z.S. and A.S. were placed with Juan and Nichie Jones. Ah.S. was also placed with the Jones family at one point, but was later moved to his current foster home due to his special needs. Both homes are said to be appropriate and the children are very bonded to their caregivers. Both families have expressed an interest in adopting the children that are currently in their care if permanent custody is granted. Over the course of this proceeding, the children visited together frequently, and both caregivers indicated that they would continue to allow the siblings to maintain their relationships if they are able to adopt the children.
 {¶ 42} Yokendra has not visited with the children since November 2004. She testified that she did not visit her children because she was homeless, and also because she had heard that they were staying with the Jones family and doing fine.
 {¶ 43} Melvin had liberal visitation available to him while the children were placed with the Jones family, but failed to take full advantage of it. According to Juan Jones, Melvin's visits at his home were irregular and were approximately once a month. Otherwise, Melvin had weekly supervised visits, which were later changed to biweekly visits.
 {¶ 44} Fourth, there was evidence before the trial court that supported its conclusion that the children's need for a secure permanent placement could only be met by a grant of permanent custody to the agency. Caseworker Brock testified that the children deserve a permanent placement and that it was in their best interests to be placed in the permanent custody of CSB. She stated that neither parent had made sufficient progress to demonstrate the ability to care for the children and provide the stability and security of a safe environment, and no suitable relatives are willing to assume legal custody.
 {¶ 45} Through the last two years, the children have been in three relative placements and at least two foster placements. These multiple placements have involved several moves back and forth. The children have been separated from each other at times, and they have been removed from a parent twice. As a result, caseworker Brock said that all the children are in dire need of stability and permanency. They are still young and able to be adopted. Because of their special needs, they require a structured home.
 {¶ 46} Juan Jones testified that he and his wife are willing to adopt three of the children so that they can remain together and in the family. There is structure and stability in their home, and the children have benefited from it. There appears to be love and a significant bond between the children and the Jones family. Ah.S. is not currently placed with a relative, but his foster mother is willing to adopt him and is very open to allowing the siblings to visit and maintain a relationship. Ah.S. has thrived in this placement.
 {¶ 47} Yokendra argues on appeal that CSB failed to consider Donita Thompson's interest in legal custody of the youngest child. At the permanent custody hearing, Thompson expressed a willingness to provide care for the children "if I had to take them," and also stated that she would need financial assistance. She stated her opinion that it would be in the best interest of Ah.S. to stay in his current placement because he was comfortable and doing well there, and that it would also be better for the oldest three children to remain with Nichie and Juan Jones.
 {¶ 48} During the course of her work on this case, caseworker Brock left several telephone and letter messages for Thompson to assess her interest in assuming legal custody of the children, but the messages went unanswered. As to Thompson's ability to assume care for any or all of these children, Brock noted that the children had once been placed with Thompson, but had to be removed because of the financial strain to her and her family.
 {¶ 49} In her appellate argument, Yokendra implies that the Jones family was misled by CSB as to the financial consequences of adoption as opposed to those of legal custody, and that the wishes of a potential adoptive family should not control the agency's opinion regarding a secure placement for the children. There was, however, no demonstration by any evidence or citation to any applicable authority that Jones was actually misled. Further, notwithstanding cross-examination on this point by Yokendra's counsel, Jones did not change his position. In fact, Jones concluded his testimony by expressing his preference for adoption, not only because of any financial aspects, but also because of the permanence of adoption.
 {¶ 50} Moreover, caseworker Brock testified that, at the time of the permanent custody hearing, there were no viable relatives who were willing to take legal custody of the children. The evidence before the trial court supports its conclusion that the children's need for a secure permanent placement could only be achieved by a grant of permanent custody to the agency.
 {¶ 51} PPLA was not a viable option because of the young age of the children, according to the testimony of caseworker Brock. The guardian ad litem also stated that PPLA would not be good for these children because of the instability and uncertainty of it. The trial court found that the children do not meet the statutory requirements for a PPLA.
 {¶ 52} The guardian ad litem stated her belief that if the children were placed in permanent custody and adopted by their current caregivers, they could continue to have relationships with their parent or parents, and that that would be in their best interests. The guardian ad litem also stated that permanent custody is in the best interests of the children because it would enable them to have stability, safety, and security. She emphasized that the children would benefit from being able to continue their relationships with each other. She did not believe that Melvin would be able to provide a safe home for the children. Yokendra has failed to comply with any aspect of her case plan. Most significantly, she has failed to maintain contact with her children for long stretches of time. There is no basis to conclude that she is able to provide the children with the permanency and stability they need.
 {¶ 53} These four children have been in care for the maximum time permitted by statute. Despite two extensions, neither parent has been able to demonstrate the ability to provide a safe and secure home for their children.
 {¶ 54} Given the evidence before the trial court, this Court cannot say that the trial court lost its way in concluding that permanent custody to CSB was in the best interests of the children. Because we have concluded that the weight of the evidence supports the trial court's finding, the evidence must necessarily be sufficient to support that finding. See State v.Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462. Yokendra's assignment of error and Melvin's assignment of error are both overruled.
 III. {¶ 55} Yokendra's sole assignment of error is overruled. Melvin's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed equally to both appellants.
Slaby, P.J., Whitmore, J., concur.
[1] A determination that Melvin was not the biological father of E.B. was made during the course of the proceedings below.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.