[Cite as *In re M.W.*, 2011-Ohio-3886.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: M.W., G.B., AND C.B.

C.A. No.    11CA009975

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    02JC97421
                      09JC28257
                      09JC28258

DECISION AND JOURNAL ENTRY

Dated: August 8, 2011

WHITMORE, Judge.

{¶1} Appellant, Erin W. ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights to three of her minor children and placed them in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I

{¶2} Mother is the natural mother of M.W., born June 11, 2002; G.B., born January 4, 2005; and C.B., born March 15, 2006. Although Mother's fourth child was born during the pendency of this case and she was pregnant with her fifth child at the time of the permanent custody hearing, those children are not at issue in this appeal.

{¶3} Mother's history with LCCS dates back to before M.W.'s birth. LCCS worked with Mother during her pregnancy because she was a minor at the time. Although Mother had planned to place her first child for adoption, she changed her mind after M.W. was born.

Because the maternal grandparents would not allow Mother to live in their home with a baby, Mother did not have a home for M.W. Consequently, M.W. was removed from her custody, adjudicated a dependent child, and placed in the temporary custody of LCCS. During the pendency of that case, Mother and M.W. were placed in the same foster home for a period of time, but were later placed in separate homes. LCCS eventually sought and obtained permanent custody of M.W. This Court reversed that judgment on appeal, however, because the evidence did not support the trial court's finding under R.C. 2151.414(E) that M.W. could not be placed with Mother within a reasonable time or should not be placed with her. *In re M.W.*, 9th Dist. No. 03CA008342, 2004-Ohio-438.

{¶4} After this Court reversed the permanent custody decision, the trial court continued M.W. in the temporary custody of LCCS, with the goal of reunifying her with Mother. After Mother complied with the case plan goals, M.W. was returned to her custody in October 2004, under an order of protective supervision by LCCS. Mother gave birth to her second child, G.B., on January 5, 2005. On September 30, 2005, Mother was granted legal custody of M.W. and protective supervision by LCCS was terminated. Mother's third child, C.B., was born the following March.

{¶5} Several years later, in September 2009, Mother sought the help of the maternal grandparents because she had no place to live. The maternal grandparents agreed to care for her three children on a temporary basis while Mother tried to find housing. They would not allow Mother in their home because Mother and her step-father have always had a poor relationship. The grandparents would not allow Mother to visit the children in their home, but the grandmother was willing to take them to meet with her elsewhere. Although the grandmother repeatedly arranged visits between Mother and the children at other locations, after she

transported the children to the agreed location, Mother failed to show up. Mother never visited the children during the six months that they lived with their grandparents.

{¶6} During October 2009, Mother's fourth child was born several weeks pre-term. The baby weighed only three pounds and required an extended hospital stay.[1] LCCS again became involved with Mother's family because she tested positive for marijuana the day before her fourth child's birth and later came to visit him at the hospital with visible bruising on her body, which she admitted was the result of domestic violence by the baby's father. Despite making arrangements with hospital staff to protect her from the baby's father, Mother allowed him to visit the baby at the hospital while she was also present in the room.

{¶7} LCCS was also concerned that Mother was again without a stable place to live. Although the maternal grandparents were providing care for M.W., G.B., and C.B., they were not willing or able to take in an additional, special-needs child or to provide a home for Mother's older children on a long-term basis. Consequently, on December 4, 2009, LCCS filed dependency complaints for G.B. and C.B. and a motion for a further dispositional order regarding M.W., seeking protective supervision of the three children.

{¶8} For the next several months, M.W., G.B., and C.B. continued to reside with their grandparents. By March 2010, the grandparents were no longer willing to provide a home for them. Although LCCS considered many other relatives for possible placement of the children, it was unable to find another suitable relative who was willing and able to provide a home for them. Consequently, LCCS placed M.W., G.B., and C.B. in a foster home, where they have lived together ever since.

---

[1] Although LCCS also assumed custody of that child, because he is not at issue in this case, the record includes few details about him.

{¶9} When the children were initially placed in foster care, Mother visited them on a sporadic basis, attending approximately half of the scheduled visits. After June 11, 2010, however, she did not visit the children or have any other contact with them. Mother would call the caseworker and claim that she wanted to see the children, so the caseworker repeatedly scheduled visits. After Mother missed several visits, the caseworker scheduled meetings to discuss the case plan. Mother never attended the scheduled visits or appointments, however, and often did not contact the caseworker until days or weeks later. This pattern continued through November, 2010.

{¶10} After Mother repeatedly missed visits with the children, the caseworker would not schedule another visit until they met to discuss Mother's reasons for missing visits and her failure to comply with the case plan. Mother had not been addressing the problems that had led to the removal of her children from her custody: substance abuse, domestic violence, and lack of stable housing and employment. She had not started drug treatment and had submitted only two urine samples for drug screening, one of which tested positive for marijuana. Although Mother claimed to have a job, she never provided LCCS with proof of her employment.

{¶11} After Mother failed to have any contact with the children for 98 days, LCCS moved for permanent custody of M.W., G.B., and C.B. It alleged that the parents had abandoned the children and that permanent custody was in the children's best interests. Under the first prong of the permanent custody test, LCCS alternatively alleged that the children could not be returned to Mother's custody within a reasonable time or should not be returned to her because she had failed to substantially remedy the conditions that had caused the continued removal of the children from her home. Following an evidentiary hearing, the trial court found that LCCS established both of its alternate grounds for permanent custody. Consequently, it terminated

Mother's parental rights to M.W., G.B., and C.B. and placed them in the permanent custody of LCCS. Mother appeals and raises three assignments of error.

II

<u>Assignment of Error Number One</u>

"THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY PURSUANT TO [R.C.] 2151.413(D)(1)[.]"

{¶12} Mother argues that LCCS failed to comply with R.C. 2151.413(D)(1) by filing the permanent custody motion before the children had been in its temporary custody for a period of 12 months. We disagree.

{¶13} Although it is well settled that a children services agency must have temporary custody of children for at least 12 months at the time its files a permanent custody motion under the "12 of 22" provision of R.C. 2151.414(B)(1)(d), see *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, LCCS did not allege the "12 of 22" ground in its permanent custody motion. Instead, it based the first prong of the permanent custody test on abandonment by the parents and Mother's failure to substantially remedy the conditions that led to the continued removal of the children from her home. See R.C. 2151.414(B)(1)(b) and (E)(1).

{¶14} Given that LCCS did not base its permanent custody motion on the "12 of 22" ground, Mother's argument is without merit. Mother relies on an Ohio Supreme Court case that construed a former version of R.C. 2151.413(A), which required the agency to have temporary custody of a child for a continuous period of at least six months immediately before it filed for permanent custody. See *In re Hayes* (1997), 79 Ohio St.3d 46, syllabus. As this Court explained in *In re G.B.*, 9th Dist. No. 22628, 2005-Ohio-4540, at ¶21, effective September 18, 1996, R.C. 2151.413 was amended to eliminate the six-month prerequisite for filing a motion for permanent

custody. "R.C. 2151.413(A) does not provide a time-bar to the filing of the motion for permanent custody in this case." Id.

{¶15} The legislative purpose in removing the six-month time-bar and later enacting the "12 of 22" provisions in R.C. 2151.413 and 2151.414 was to require children services agencies to more quickly find permanent homes for children who have been adjudicated abused, neglected, or dependent to prevent them from languishing in the foster care system for years. Under the current version of R.C. 2151.413(D)(1), cited by Mother, an agency is required to file a motion for permanent custody after the children have been in its temporary custody for "12 of 22" months, unless the agency documents a compelling reason that permanent custody is not in the children's best interests, it has failed to make reasonable efforts when required to do so, or it has already received permanent custody of the children. See R.C. 2151.413(D)(3).

> "Prior to the H.B. 484 amendments, R.C. 2151.413 was a permissive statute, setting forth only situations in which an agency *could* file for permanent custody. See former R.C. 2151.413, Sub.H.B. No. 419, 146 Ohio Laws, Part III, 4660, 4679. After H.B. 484's amendments, an agency *must,* except in limited circumstances, file for permanent custody once a child has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. See R.C. 2151.413(D)(1)." (Emphasis sic.) *In re C.W.*, at ¶20.

{¶16} Although R.C. 2151.413(D)(1) requires an agency to file for permanent custody after 12 months of temporary custody if none of the enumerated conditions exist, R.C. 2151.413 does not prohibit it from filing sooner. Because Mother has failed to demonstrate that LCCS violated R.C. 2151.413(D)(1) by filing the permanent custody motion before the children had been in its temporary custody for 12 months, her first assignment of error is overruled.

Assignment of Error Number Two

"THE TRIAL COURT ERRED IN FINDING THAT THE CHILDREN WERE ABANDONED."

{¶17} Mother argues that the trial court's finding under R.C. 2151.414(B)(1)(b) that the children had been abandoned by their parents was not supported by the evidence. We disagree.

{¶18} Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 99.

{¶19} The trial court found that the first prong of the test was satisfied for all three children because they had been abandoned by their parents and they could not be placed with either parent within a reasonable time or should not be placed with them. See R.C. 2151.414(B)(1)(b) and (E). LCCS correctly notes that any error in the trial court's finding of abandonment did not prejudice Mother because it made an alternate finding that the children could not be placed with Mother within a reasonable time or should not be placed with her. Nevertheless, this Court will address the merits of Mother's challenge to the trial court's finding of abandonment because it was supported by considerable evidence that demonstrates the propriety of the trial court's decision to terminate her parental rights.

{¶20} R.C. 2151.011(C) provides that, for purposes of R.C. Chapter 2151, a presumption of abandonment arises when the children's parents "have failed to visit or maintain contact with the child[ren] for more than ninety days[.]" Mother does not challenge the trial court's finding that the children's fathers had abandoned them by failing to have any contact with them for more than one year. Mother also does not dispute that LCCS presented evidence that she failed to have any contact with her children for much longer than 90 days. Her last visit with the children was on June 11, 2010 and she had no contact with them through the date of the hearing in February 2011. Mother attempts to justify her failure to visit the children by arguing that LCCS prevented her from seeing them.

{¶21} Through her own testimony at the hearing, Mother attempted to explain why she had no contact with her children for several months. She claimed that LCCS placed unreasonable conditions on visitation and that it refused to help her with transportation. Her testimony, however, was sharply disputed by the testimony of her two caseworkers and other witnesses. Moreover, through cross-examination by LCCS and the guardian ad litem, Mother essentially admitted that several of her explanations were not believable. The trial court explicitly found that Mother was a difficult witness and that her credibility was questionable.

{¶22} A review of all of the evidence presented at the hearing reveals that LCCS went above and beyond any obligation it had to facilitate Mother's attendance at visitation. LCCS adjusted the time and location of the visits to accommodate Mother and even offered to transport the children to visit her at her home, after she moved to Cuyahoga County and told her caseworker that she had difficulty attending visits in Lorain County. On the other hand, evidence throughout the three-day hearing demonstrated that Mother refused to take even

minimal steps to cooperate with her caseworkers and service providers, but continued to blame everyone but herself for her inability to see her children.

{¶23} For example, before it would allow the children to visit with Mother at her home in Cuyahoga County, LCCS required one visit to the home to approve its safety. The caseworker repeatedly scheduled appointments with Mother for home visits, but Mother was never there. In fact, Mother had already made plans to move back to Lorain County at the time she made each appointment for the caseworker to visit her home in Cuyahoga County, but she neglected to inform her caseworker. At some point during the next several weeks, Mother moved back to Lorain County. It is unclear when she actually moved, as she did not timely inform her caseworker about her relocation and her testimony on that subject was sharply contradicted by other evidence. After Mother moved back to Lorain County, she lived within walking distance of the LCCS visitation center, yet she still did not meet with her caseworker or visit with the children during that time.

{¶24} Another example of Mother shifting the blame for her failure to maintain contact with her children involves her arrest and incarceration on shoplifting charges. Although she suggested at the hearing that LCCS included the term of her involuntary incarceration within its 90-day abandonment calculation, the record reveals otherwise. Mother missed a scheduled visit with her children on July 6, 2010, because she was arrested that day for shoplifting. She did not call her caseworker to explain her absence, nor did she contact her during the next month. Instead, on August 11, Mother left a voicemail message for the caseworker, stating that she could not visit the children until the end of the month because she was required to report on August 17 to serve her 10-day jail sentence. Mother did not report in August to serve her jail time, however, nor did she communicate with her caseworker for the next several weeks.

{¶25} On September 4, a Saturday, Mother left a voicemail message for the caseworker that she wanted to see her children. Although the caseworker was eventually able to confirm two different appointment times with Mother during the month of September, Mother failed to show for either appointment. After missing each appointment, Mother called the caseworker over the weekend and left a message for her. By the end of September, Mother had failed to have any contact with her children for 111 days. Because she had not reported on August 17 to serve her original jail sentence, she was required to serve 50 days in jail, beginning in early October, after she had failed to visit her children for well over 90 days.

{¶26} The evidence presented at the hearing demonstrated that it was Mother, not anyone else, who was responsible for Mother's failure to visit her children or be reunified with them. Throughout this case, Mother refused to work on the goals of her case plan or cooperate with either of her caseworkers. She did not keep her caseworkers informed about changes in her residence or work schedule, nor was she honest with them when she did communicate. Moreover, Mother tended to call her caseworker over the weekend, leaving a voicemail message for her, rather than communicating directly with her. Mother admitted that she did not have a good relationship with her caseworker and often argued with her about her need to comply with the case plan. She refused to submit urine samples for drug screening, participate in appropriate substance abuse or domestic violence treatment, or meet with her caseworker about her failure to work on the reunification goals of the case plan. At the hearing, Mother maintained the position that she had a legal right to see her children and that "it doesn't matter what [LCCS] want[s] me to do."

{¶27} The trial court's finding of abandonment was supported by ample evidence. It reasonably found that the testimony of Mother lacked credibility and did not serve to excuse her

failure to visit her children for more than 90 days. Mother's second assignment of error is overruled.

Assignment of Error Number Three

"IT WAS NOT IN THE BEST INTEREST OF THE MINOR CHILDREN FOR THE TRIAL COURT TO GRANT PERMANENT CUSTODY WHEN THERE WAS A STRONG PARENT/CHILD BOND[.]"

**{¶28}** Finally, Mother asserts that the trial court erred in finding that permanent custody was in the children's best interests. When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider the following factors:

"(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

"(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

"(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ***;

"(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)(a)-(d).[2]

**{¶29}** Mother focuses her argument solely on the first best interest factor. She maintains that permanent custody was not in her children's best interests because the evidence demonstrated that there was a strong bond between Mother and her children. We disagree.

**{¶30}** Mother supports this argument with her own testimony that the children were bonded with her and that, when she visited, they did not want her to leave. She also points to the

---

[2] The factor set forth in R.C. 2151.414(D)(1)(e) is not relevant in this case.

testimony of the children's counselors that each child was suffering from an adjustment disorder. The evidence before the trial court demonstrated that, although Mother loved her children, they had suffered emotional damage from her failure to consistently maintain contact with them. Each child suffered from an adjustment disorder, a condition that had been exacerbated by Mother's failure to visit them on a regular basis. M.W. in particular, who had spent most of her eight-year life moving in and out of Mother's custody, suffered "extreme anxiety" about her separation from Mother and became very distressed when Mother failed to show up for scheduled visits. While the children were living with their grandparents, the grandmother told the caseworker that she stopped telling them when she scheduled visits with Mother because they became distraught when Mother repeatedly failed to come.

{¶31} During the 17 months before the hearing, Mother had failed to maintain contact with her children for months at a time. She always blamed others for her failures and apparently thought that she could just drop in and out of her children's lives. Ultimately, after Mother had missed over five months of visits while the children were in foster care, their counselors advised LCCS that visits should not be resumed unless the permanent custody motion was denied because the children had already suffered too much emotional damage from Mother repeatedly coming in and out of their lives.

{¶32} On the other hand, the children had made significant progress in counseling and while placed together in the foster home. They were closely bonded to each other and had become assimilated into the foster family. For the first time in their lives, they were living in a stable home environment. The children's therapists and the guardian ad litem testified that the foster parents provided a calm, loving, and structured home and made great efforts to work with

the counselors to help the children adjust. Each child had expressed a desire to stay with the foster parents and the foster parents wanted to adopt all three of them.

{¶33} Although Mother does not contest the trial court's findings on the remaining best interest factors, the record fully supports the trial court's conclusion on all the factors that permanent custody was in the children's best interests. The children had told others that they wanted to stay with the foster parents and the guardian ad litem opined that permanent custody was in their best interests. Their custodial history had involved many periods in and out of Mother's custody, and they were in need of a legally secure permanent placement. LCCS had made extensive efforts to place the children together with relatives, but there were no suitable relatives who were willing and able to provide a stable permanent home for them. Consequently, the trial court reasonably concluded that a legally secure permanent placement could only be achieved by granting permanent custody to LCCS. Because Mother has failed to demonstrate error in the trial court's best interest finding, her third assignment of error is overruled.

III

{¶34} Mothers' assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETH WHITMORE
FOR THE COURT

CARR, P. J.
MOORE, J.
CONCUR

APPEARANCES:

BARBARA A. WEBBER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and AMY PRICE, Assistant Prosecuting Attorney, for Appellee.